In re AMERICAN RESOURCES MANAGEMENT CORP., Debtor.

Bankruptcy No. 84C–01749.

United States Bankruptcy Court, D. Utah.

June 25, 1985.

Robert B. Lochhead, Rooker, Larsen, Kimball & Parr, Salt Lake City, Utah, for Land & Marine Rental Co.

Anna W. Drake, Nielsen & Senior, Salt Lake City, Utah, for trustee.

William G. Fowler, Roe, Fowler & Moxley, Salt Lake City, Utah, for Unsecured Creditors' Committee.

David E. Leta, Hansen, Jones, Maycock & Leta, Salt Lake City, Utah, for Tidewater Compression Service, Inc.

Jonathan M. Landers, Morrison & Foerster, San Francisco, Cal., and David M. Connors, LeBoeuf, Lamb, Leiby & MacRae, Salt Lake City, Utah, for Crocker Nat. Bank.

REVISED MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

### CASE SUMMARY

This matter comes before the Court on the trustee's motion for reconsideration and clarification of its ruling of March 26, 1985, wherein the Court allowed certain administrative expenses and authorized payment of one-half of such expenses. The Court is called upon to decide (1) whether interim professional fees should be awarded from property of the estate subject to Crocker National Bank's security interests and Section 364(c)(1) superpriority; and (2) whether Crocker National Bank has the prerogative, pursuant to post-petition financing arrangements approved by the Court, to selectively determine which administrative claimants may be paid, and in what amount. For the reasons hereinafter set forth the Court shall authorize the trustee to pay all fees incurred by his attorneys and accountants as previously allowed, and to distribute the sum of $15,000 pro rata to the attorney for the creditors' committee and the accountant for the creditors' committee, respectively, based on their fees and costs previously allowed.

### FACTUAL AND PROCEDURAL BACKGROUND

American Resources Management Corporation, the debtor, is in the business of development and production of oil and gas. Its principal assets consist of interests in developed and undeveloped oil and gas properties in Colorado. On March 1, 1984, Crocker National Bank ("Crocker") filed a complaint in state court in Colorado to foreclose its interests in the debtor's property and for a money judgment in the amount of $35,329,203.24, plus interest. The debtor confessed judgment in that proceeding. On June 27, 1984, an involuntary petition under Chapter 11 was filed against the debtor by Land & Marine Rental Company, Wayne A. Siggard, Dowell Division of Dow Chemical U.S.A., and Western Air Drilling Service Company. An order for relief was entered on July 20, 1984. Anthony C. Pimm was appointed trustee by order of the Court dated July 30, 1984.[1]

1. On August 3, 1984, the Court approved a stipulation between the trustee, Crocker and the petitioning creditors to allow the trustee to borrow

$2,500 from Crocker in order to pay his bond premium. Crocker was accorded a superpriori-

On March 19, 1985, the Court heard the motion of Crocker National Bank for relief from the automatic stay to foreclose its interests in various oil and gas producing properties and other assets of the debtor. The motion was opposed by the trustee and the creditors' committee. For the purpose of that hearing, the parties stipulated that Crocker had a perfected security interest in virtually all of the debtor's parcels of real property, oil and gas interests, and other collateral to secure a claim in the amount of at least $37 million, and that the value of the collateral securing its claim was at most $8 million. The Court determined that the debtor had no equity in the properties, and the same were not necessary to an effective reorganization and granted relief from the automatic stay pursuant to Section 362(d)(2) of the Bankruptcy Code.

All revenue from post-petition production has been turned over to Crocker since entry of the order for relief. In order to obtain funds to preserve and maintain the assets of the estate and continue operation of its wells during the pendency of the Chapter 11 case, the trustee entered into two stipulations with Crocker National Bank to provide post-petition financing.[2] The first stipulation, approved by the Court on September 28, 1984, after a hearing on limited notice,[3] provided that the bank would make available to the trustee up to $27,000 per month for actual operating expenses. The stipulation and the order approving it provided that any advances made by Crocker under the agreement were entitled to a "priority over all unsecured claims and administrative expenses of a kind specified in 11 U.S.C. §§ 503(b) and 507(b)." The first stipulation expired by its terms on November 28, two months later.

The first stipulation was superseded by a second stipulation, dated March 19, 1985, and approved by the Court after notice and a hearing on April 7, 1985. It provided that the bank would make available to the trustee up to $29,000 per month for operating expenses. It further provided that all administrative expenses would first be paid out of assets not subject to Crocker's security interests and liens, including assets recovered by the trustee in the exercise of his avoiding powers.[4] The stipulation anticipated that the unencumbered assets might be insufficient to satisfy all administrative claims and provided a formula under which Crocker agreed to permit a limited amount of its cash collateral to be used, up to $30,000 for the trustee's attorneys' fees and up to $15,000 for attorneys and accountants employed by the creditors' committee.[5]

---

ty under Section 364(c)(1) for funds advanced pursuant to the stipulation.

2. The stipulations are in the nature of motions for authority to obtain credit or incur debt pursuant to Section 364(c)(1).

3. Counsel for the creditors' committee was present at the hearing and did not object to the stipulation.

4. The trustee has recovered approximately $50,000 in a preference action, which is subject to no encumbrance other than the superpriority claim of Crocker National Bank arising under its post-petition financing agreements with the debtor.

5. The stipulation provided in pertinent part as follows:
   17. The parties have agreed that all administrative costs shall first be paid out of assets of the estate which are not subject to Crocker's security interests and liens including, but not limited to: (a) assets and properties of the estate which are not to be transferred to the Bank under the plan of reorganization dated January 4, 1985 or any amendment thereof; and (b) any recoveries by the exercise of the Trustee's avoidance powers under sections 544 et seq. of the Bankruptcy Code. If such sums are not sufficient to pay such administrative expenses, Crocker agrees that a portion of the proceeds of the Production Contracts may be used to pay certain administrative costs only as follows:
   (a) The reasonable, necessary fees and expenses of the Trustee and his counsel; *provided, however,* that the Trustee's fee will be limited to $150 per hour, the fees of the Trustee's counsel shall not exceed $30,000. These fees shall not include any amounts to investigate or prosecute claims involving Crocker.
   (b) The reasonable and necessary costs of legal and accounting fees of the creditors' committee, and the expenses of such committee, limited to an aggregate for all such fees and expenses of $15,000, *provided, however,* that this amount shall not cover any costs,

On March 26, 1985, a hearing was held to consider applications for allowance of interim compensation filed by the trustee, his accountant and attorney, and the accountant and attorney for the creditors' committee.[6] The Court overruled Crocker's objections to the form and content of the applications and the reasonableness of the fees requested, and allowed each request as prayed. However, the Court authorized the trustee to pay only one-half of the fees and costs allowed.

■ The trustee has now come before the Court asking for clarification and reconsideration of its prior fee ruling. Specifically, the trustee wants to know whether the professional fees are to be paid from production revenues, which are being remitted to Crocker, or from the funds recovered in the preference action. The trustee also requests a determination as to whether the ruling on the allowance and payment of professional fees was intended to overrule either of the orders approving the post-petition financing stipulations with Crocker.[7] Finally, the trustee asks the Court to reconsider its ruling that only one-half of the fees and costs previously allowed be paid. The trustee contends that the $50,000 recovered in the preference action is sufficient to pay *all* fees incurred by the trustee, his accountant and attorney, together with $15,000 to be allocated pro rata between the accountant and attorney for the creditors' committee. In response, the creditors' committee urged the Court to authorize payment of all fees and costs allowed to its accountant and attorneys, without regard to the $15,000 ceiling imposed by Crocker.[8] This matter was heard by the Court on April 11, 1985, and taken under advisement.[9] The Court has considered the helpful memoranda of the parties, the statements and arguments of counsel, and upon its review of the applicable legal authorities, renders its decision as follows.

## *The Section 364(c)(1) Superpriority Versus Interim Professional Compensation: Who Gets What, When, and How?*

■ Counsel for the creditors' committee argues that, notwithstanding Crocker's superpriority under Section 364(c)(1)[10] and

---

fees, and expenses to investigate or prosecute claims involving Crocker.

6. The requests may be summarized as follows:

| Applicant | Fees | Costs |
|---|---|---|
| (1) Roe, Fowler & Moxley | $21,232.00 | $ 943.34 |
| (2) Anthony Pimm | 6,000.00 | — |
| (3) Nielsen & Senior | 21,621.50 | 2,095.10 |
| (4) KMG/Main Hurdman | 5,953.25 | 133.38 |
| (5) Robinson, Hill & Company | 13,367.60 | 304.50 |
| (6) Land & Marine Rental Co. | 6,851.75 | 766.79 |

7. This Court possesses inherent equitable power to set aside its orders approving the stipulations if the orders contravene the Bankruptcy Code and if the parties can be restored to the positions they occupied before they entered the stipulation. *See A & A Sign Company v. Maughan,* 419 F.2d 1152, 1155 (9th Cir.1969). *Cf. Pfister v. Northern Illinois Finance Corp.,* 317 U.S. 144, 152, 63 S.Ct. 133, 87 L.Ed. 146 (1942); *Wayne United Gas Co. v. Owens-Illinois Glass Co.,* 300 U.S. 131, 137, 57 S.Ct. 382, 81 L.Ed. 557 (1937). But the Court shall not remove a material part of the stipulation over the objection of one of the parties to it and enforce the rest of the agreement. *A & A Sign Company v. Maughan, supra,* 419 F.2d at 1155.

8. The Court also heard the request for allowance of an administrative expense filed by Land

& Marine Rental Company under Section 503(b)(3)(A). Crocker withdrew its objection to the allowance of this claim, but opposed its payment from funds subject to Crocker's security interests and superpriority claims. Tidewater Compression Service, Inc. opposed payment of any administrative claims until the amount of its administrative claim was determined. Crocker acknowledged that this claim would be proper under Section 506(c) and would be paid by Crocker upon allowance by the Court.

9. Due to the exigent nature of this matter, the Court initially issued a memorandum opinion deciding these issues on April 23, 1985. This revised memorandum opinion is intended to correct a number of minor errors in, elaborate upon, and supersede the prior decision.

10. Section 364(c)(1) provides:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

the absence of unencumbered assets, the fees and costs previously allowed under Section 331 to the accountant and attorney for the creditors' committee should be paid in full from the bank's cash collateral.[11] Its argument is based on the contention that a Section 364(c)(1) superpriority "is subservient to allowances and payment of interim compensation pursuant to § 331[.]"[12] In support of this analysis of the statutory scheme of priorities under the Bankruptcy Code, counsel relies primarily on the decision of this Court in *In re Callister*, 15 B.R. 521, 8 B.C.D. 446, 5 C.B.C.2d 1058 (Bkrtcy.D.Utah 1981), *appeal dismissed*, 673 F.2d 305 (10th Cir.1982), *aff'd*, 13 B.C.D. 21 (10th Cir.1984).[13]

In *Callister, supra,* a superpriority claim arose under Section 507(b) when the adequate protection provided to Ingersoll-Rand Financial Corporation proved inadequate. The Court held that notwithstanding the existence of the superpriority, the bankruptcy court had the discretion to authorize

payment of interim attorneys' fees under Section 331.[14]

Crocker argues that the creditors' committee has no right to seek payment of accountant's and attorneys' fees from collateral subject to its liens and superpriority claims, except as consented to by Crocker, and, to the extent *Callister* holds otherwise, it should be rejected.[15] In support of its position, Crocker relies primarily on *In re Flagstaff Foodservice Corp.*, 739 F.2d 73 (2d Cir.1984). In that case, an undersecured pre-petition lender, General Electric Credit Corporation, provided post-petition financing to the debtor pursuant to an order, like those in the present case, which provided for "priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b)" of the Code. When the reorganization failed and there were insufficient unencumbered assets to satisfy administrative claims, the bankruptcy court nonetheless approved interim fee awards to attorneys and accountants for the debtor and the creditors' committee.

---

**11.** It was suggested at the hearing that Crocker improved its position by virtue of the two financing agreements since, had it foreclosed its security interests, it would have been necessary to employ Mr. Pimm, or someone with similar qualifications, to operate the wells, and it would have been necessary to advance operating funds in order to do so. Thus, the argument goes, Crocker has created a situation in which its necessary expenses become a superpriority claim. This, however, in no way improves Crocker's non-bankruptcy position because without the intervention of bankruptcy Crocker's interest in the debtor's assets would likewise be superior to all others.

**12.** Memorandum of Creditors' Committee in Support of Payment of Interim Allowance, at 8 (April 11, 1985).

**13.** At the hearing on this matter, counsel for Crocker questioned the precedential value of unpublished opinions of the Tenth Circuit. Rule 17(c) of the Rules of Court of the United States Court of Appeals for the Tenth Circuit provides that "[u]npublished opinions, although unreported, can nevertheless be cited, if relevant, in proceedings before this or any other court." Furthermore, since the hearing the decision has been published at 13 B.C.D. 21.

**14.** It should be noted that in *Callister* the Court found that the debtor had $323,122 in unencumbered assets. *Id.* at 523, n. 7. The *Callister*

decision is further explained by this Court in *In re IML Freight, Inc.*, 52 B.R. 124 (Bkrtcy. D.Utah 1985).

**15.** Crocker suggests that *Callister* may be distinguished from the present case because *Callister* involved a Section 507(b) superpriority, and the financing orders herein provided for a Section 364(c)(1) superpriority. For the purpose of its decision today, the Court finds it unnecessary to draw a distinction between the superpriority which arises under Section 507(b) when there is an adequate protection shortfall and the consensual superpriority approved by the Court for post-petition borrowing under Section 364(c)(1). The Court notes that under the Bankruptcy Code there are at least three superpriorities. The Section 507(b) superpriority is given when adequate protection provided under Section 361 proves to have been inadequate. A superpriority under Section 364(c)(1) may be given to a post-petition lender when the debtor is unable to obtain unsecured credit. Debt incurred under that subsection may be given priority over all administrative expenses and Section 507(b) superpriority expenses. Finally, if a Chapter 11 case is converted to Chapter 7, Section 726(b) provides that the Chapter 7 administrative expenses are entitled to a superpriority over the administrative expenses of the Chapter 11.

The awards were affirmed by the district court. The Second Circuit reversed, holding that General Electric had neither consented to payment of professional fees nor had received such benefit as would give rise to a Section 506(c) claim, and, from the plain language of Section 364(c)(1), the security interest and superpriority claims of General Electric were of a higher priority than the fee claimants.

■ In this Court's view, *Callister* and *Flagstaff Foodservice* are not inconsistent. As between interim fee awards, other administrative expenses, and superpriority claims, the order of payment is not fixed by the Bankruptcy Code or the Bankruptcy Rules. The superiority in rank and position of Section 364(c)(1) claims does not require that all such claims be paid in full before any part of a Section 503(b) claim may be paid. *Cf. In re IML Freight, Inc.,* — B.R. ——, No. 83C–01950 (Bkrtcy.D. Utah June 25, 1985). *Callister* states that some administrative expenses may be paid during the course of the case and that generally interim professional fees should be paid. *Callister* does not mandate that interim fees be paid ahead of superpriority claims, but creates a rebuttable presumption in favor of payment, "notwithstanding the existence of a superpriority." *Id.* at 535. The Court's decision to allow payment in that case was explicitly predicated on the particular facts and circumstances found to be present.

■ Payment of professional fees in Chapter 11 cases is a favored object of the Bankruptcy Code, but it is no more favored than protecting the rights of creditors with secured claims. As a general rule, expenses of administration must be satisfied from assets of the estate not subject to liens. *See In re New England Carpet Co.,* 28 B.R. 766, 771 (Bkrtcy.D.Vt.1983). A secured creditor's interest in its collateral is a substantive property right created by nonbankruptcy law which may not be substantially impaired when bankruptcy intervenes. *See Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935); *In re Utilities Power & Light Corporation,* 29 F.Supp. 763, 769–70 (N.D.Ill.1939). Generally, the only valid liens that are subordinated to administration expenses are tax liens and ERISA liens. 11 U.S.C. § 724(b) and (d); 4 COLLIER ON BANKRUPTCY ¶ 545.04, at 545–14 (15th ed. 1985). A secured creditor is not to be deprived of the benefit of its bargain and will be protected in bankruptcy to the extent of the value of its collateral. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 339 (1977), 1978 U.S.Code Cong.Admin. News, 5787, p. 6295. Only surplus proceeds are available for distribution to creditors of the estate and administrative claimants. Therefore, absent equity in the collateral, administrative claimants cannot look to encumbered property to provide a source of payment for their claims. 1 W. Norton, NORTON BANKRUPTCY LAW AND PRACTICE § 12.02, at pt. 12—p. 1 (1981).

■ The time of payment of administrative expenses is within the discretion of the bankruptcy court. *Matter of Isis Foods, Inc.,* 27 B.R. 156, 157 (W.D.Mo. 1982); *In re Verco Industries,* 20 B.R. 664, 665, 9 B.C.D. 161 (Bkrtcy.App.Pan. 9th Cir. 1982); *In re Misty Touch, Inc.,* 31 B.R. 853, 857 (Bkrtcy.S.D.N.Y.1983); *In re Standard Furniture Co.,* 3 B.R. 527, 532, 6 B.C.D. 270, Bankr.L.Rep. (CCH) ¶ 67,573, 2 C.B.C.2d 274 (Bkrtcy.S.D.Cal.1980). It may be appropriate to authorize payment of administrative expenses ahead of superpriority claims when there are adequate unencumbered assets in the estate, or when the bankruptcy judge has adequate assurances that there will be. While professional fees allowed under Section 331 enjoy a certain "preeminence" under the Code, *In re Callister, supra,* 15 B.R. at 534 and 535 n. 38a, their payment must be consistent with the Code's overall scheme of priorities. Post-petition attorneys' and accountants' fees are administrative expenses and may not be given priority over existing liens and superpriority claims. *See In re Roamer Linen Supply, Inc.,* 30 B.R. 932, 10 B.C.D. 1314 (Bkrtcy.S.D.N.Y. 1983).

In the present case, no Section 506(c) claim has been filed against Crocker to recover the costs of preserving or disposing of Crocker's property. Indeed, the creditors' committee does not contend that the professional services rendered by its accountant and attorney were necessary to preserve or dispose of such property. Rather, the creditors' committee appears to base its argument for immediate right to payment out of Crocker's collateral on its misinterpretation of *Callister*. Based on this view of *Callister*, counsel for the creditors' committee finds a priority not indicated by the statute, its legislative history, or case authority, and not supported by any logical view of Congress' scheme of priorities under the Code. Where the circumstances of the *Callister* case disclosed $323,122 in unencumbered assets, the Tenth Circuit held that it was not an abuse of discretion for this Court to allow payment of interim attorneys' fees in the amount of $12,046 ahead of the Section 507(b) superpriority in the amount of $29,868. In the present case, there are no unencumbered assets, and no probability was sufficiently demonstrated to the Court of unencumbered assets coming into the debtor's estate and being available to pay administrative expenses. Payment of professional fees should be allowed ahead of a superpriority claim only where the superior claim is fully protected. Under the circumstances of this case it would be an improper exercise of this Court's discretion to order payment of professional fees from Crocker's collateral.

### Section 364 Financing and Selective Payment of Administrative Expenses: A Policy Problem?

There are presently insufficient unencumbered assets available to the trustee to pay the expenses of administering the debtor's estate in full. This Chapter 11 case has been sustained largely at the expense of Crocker. Any payment authorized by the Court at this time must come from assets secured by valid liens or superpriority claims of Crocker or go unpaid. Crocker has consented to payment of certain administrative expenses, but has limited the amount of its collateral which may be paid to the accountants and attorneys employed by the creditors' committee to an aggregate sum of $15,000. The creditors' committee suggests that this arrangement is inequitable and contrary to the requirement that there are insufficient assets in the estate to pay all administrative expenses in full, claimants must share pro-rata from the available funds.

The central question here is one of policy. Should a secured creditor holding a senior lien on all assets of the debtor's estate and a superpriority claim for all post-petition advances be able to selectively waive its claims so as to permit the trustee and professional persons employed by him to receive full payment of their fees, but restrict payment of allowed fees to the professionals employed by the creditors' committee? In answering this question the Court must weigh the policy of the Code that there should be equality of treatment among administrative claimants against the necessity of permitting trustees to incur debt in order to continue to operate the debtor's business.

The Court is satisfied, based on the statements of the parties and the record in this proceeding, that in the absence of financing from Crocker the trustee could not have continued to operate the debtor's business or to preserve and maintain the assets of the estate. The creditors' committee received notice and was given a fair opportunity to be heard. It did not oppose either stipulation, and has not shown that there was coercion, undue influence or overreaching by Crocker in connection with the financing arrangements. *Cf. In re Texlon Corp.*, 596 F.2d 1092 (2d Cir.1979). On the contrary, the stipulations appear to be arm's length transactions. The trustee's urgent need for operating funds and Crocker's paramount interest in minimizing its considerable losses produced the two stipulations. They were devices reasonably designed to allow continuation of the debtor's business.

A Section 364(c)(1) superpriority may affect the rights of administrative claimants to full payment in the event sufficient funds are unavailable by subjecting them to reduction and proration. Those whose claims are subject to subordination are entitled to be fairly advised of what the trustee proposes. *Cf. Matter of Alan Wood Steel Co.*, 437 F.Supp. 949 (E.D.Pa. 1977); *In re Yellow Cab Company of Philadelphia*, 4 B.C.D. 582 (Bkrtcy.E.D.Pa. 1978). A financing order under Section 364(c)(1) will be entered only after notice and a hearing and upon a proper showing of need and inability to obtain unsecured credit allowable as an administrative expense. *Cf. In re Texlon Corp., supra*, 596 F.2d at 1092 (financing order authorizing cross-collateralization of insufficiently collateralized pre-petition debt with priority over post-petition administrative expenses should not have been granted *ex parte* upon representations of debtor in possession); *In re Garland Corp.*, 6 B.R. 456 (Bkrtcy.App.Pan. 1st Cir.1980) (flexible notice formula prescribed by Section 102(1)(A) is not so relaxed as to permit *ex parte* relief under Section 364(c)(1) in the absence of specific findings substantiating its appropriateness in the circumstances); *Matter of Sullivan Ford Sales*, 2 B.R. 350, 5 B.C.D. 1288 (Bkrtcy.D.Me.1980) (*ex parte* relief under Section 364(c)(1) should comport with the analogous requirements for *ex parte* injunctive relief under the Federal Rules of Civil Procedure). *See also* P. Murphy, CREDITORS' RIGHTS IN BANKRUPTCY § 8.04, at 8–5 (1983).

As a general rule, when the debtor's estate lacks sufficient funds to pay all administrative expenses in full, administrative claimants must share pro-rata in the available funds. *In re IML Freight, Inc., supra;* NORTON BANKRUPTCY LAW AND PRACTICE, *supra* at § 12.03, pt. 12—p. 5. Administrative claimants may run the risk of nonpayment or partial payment whenever there is an adequate protection shortfall under Section 507(b), superpriority borrowing under Section 364, or conversion of the case and subordination of Chapter 11 administrative expenses under Section 726(b). These risks are well known to experienced bankruptcy practitioners, such as the attorney for the creditors' committee in this case. "[I]n every case there is the uncertainty that the estate will have sufficient property to pay administrative expenses in full." 124 Cong.Rec. H 11,092 (daily ed. Sept. 28, 1978) (remarks of Representative Edwards), 1978 U.S.Code Cong. & Admin.News, pp. 6512–13.

Congress has encouraged professionals to participate in Chapter 11 cases by abandoning the principle that their services should command a lesser rate than in non-bankruptcy cases, *see In re Jensen-Farley Pictures*, 47 B.R. 557, 12 B.C.D. 978 (Bkrtcy.D.Utah 1985), and by providing for interim compensation under Section 331. But Congress has not removed all risks from the practice of bankruptcy law by guaranteeing payment of fees. In the present case it appears that but for Crocker's waiver of its liens and superpriority claims *no* surplus proceeds would exist from which *any* administrative expense claims could be paid.

Where there are insufficient unencumbered funds with which to pay administrative expenses, professional persons employed by creditors' committees may not ordinarily look to secured creditors for payment. "A secured creditor's consent to the payment of designated expenses limited in amount will not be read as a blanket consent to being charged with additional administrative expenses not included in the consent agreement." *In re Flagstaff Foodservice Corp.*, 762 F.2d 10 (2d Cir. 1985). Here Crocker has provided a fund out of which a substantial part of the allowed fees and costs of the accountant and attorney for the creditors' committee may be paid. If assets not subject to Crocker's liens or superpriority claims come into the debtor's estate, the balance may be paid. The financing orders do not impermissibly delegate to the secured creditor the Court's responsibility to authorize the allowance of interim compensation to professional persons, nor do they establish subclasses with-

in the administrative expense priority. There has been no prejudice to the creditors' committee.

Flexibility, not rigidity, is required in dealing with post-petition financing matters. The creditors' committee was given ample opportunity to object to the granting of a superpriority to Crocker and to its limited waiver, but did not oppose them until these fee applications were presented. The creditors' committee has been treated fairly under the financing orders and should not be heard to complain that Crocker has not agreed to underwrite all of its expenses.

Finally, there is an overriding interest in maintaining the integrity of the judicial process. The Court's orders approving the post-petition financing stipulations conferred a priority to Crocker ahead of all administrative claims. The bank advanced funds to the trustee in reliance upon those orders. The Chapter 11 process would be undermined if this Court were to, in effect, undo those orders by placing the administrative claims of the creditors' committee ahead of the superpriority which Crocker bargained for.

In this Court's view, permitting Crocker to selectively waive its liens and superpriority claims in order to allow payment of certain administrative expenses will not subvert the Bankruptcy Code's statutory scheme of priorities nor defeat its twin policies of debtor rehabilitation and fairness to creditors.

### CONCLUSION

A great deal of time and effort were expended by the attorney and accountant for the creditors' committee, and their services were of undoubted value. However, the Bankruptcy Court's power to allow payment of professional fees and other administrative claims ahead of valid liens and superpriority claims, which was recognized in *Callister*, does not mandate its exercise in every case. The Court's discretion to permit payment is restricted by the existence—present or prospective—of unencumbered assets which exceed any superpriority claim. A secured creditor may, without doing violence to the letter or spirit of the Bankruptcy Code, selectively waive its liens and superpriority claims to permit payment of certain administrative expenses but not others.

Accordingly, the Court shall authorize the trustee to pay the allowed fees and costs of the trustee, his attorneys and accountants, in accordance with the consent and stipulations previously presented, and to pay the accountant and attorney for the creditors' committee their allowed fees and costs pro rata from the $15,000 provided for such expenses. The claim of Land & Marine Rental Company shall be allowed as prayed but may not be paid without further order of the Court. The claim of Tidewater Compression Service, Inc. will be considered when an appropriate request for allowance is made.