FEINBERG, Circuit Judge:
 

 Plaintiff BII, Inc. (BII), a secured creditor in the Chapter 7 bankruptcy of IBI Security Service, Inc. (IBI), appeals from an order of the United States District Court for the Eastern District of New York, Arthur D. Spatt, J. That order affirmed orders of the Bankruptcy Court, Melanie J. Cyganowski, J., holding that a settlement agreement between BII and the Trustee did not prevent the Trustee from using 11 U.S.C. § 506(c) to surcharge the proceeds of a litigation belonging to the estate.
 
 [1]
 
 For reasons set forth
 
 *207
 
 below, we reverse the judgment of the district court.
 

 A. Background
 

 IBI, a provider of armored car services, filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in June 1991. On February 1, 1993, the ease was converted to a Chapter 7 liquidation, and Andrew Thaler was appointed as Chapter 7 trustee (the Trustee). Before conversion, IBI’s largest secured creditor, Glenfed Financial Corporation (Glenfed), had charged that the estate had been improperly using proceeds from accounts receivable and other assets that were supposed to be held as cash collateral to secure loans that had been made to IBI by Glenfed. In March 1992, the bankruptcy court had supplemented Glenfed’s remaining collateral by granting Glenfed a replacement hen in the amount of $574,583.79 on substantially ah of IBI’s assets, including the proceeds of any causes of action belonging to IBI. One of the few significant assets of the IBI estate was a complex litigation including claims by IBI against National Westminster Bank USA and Revere Armored, Inc., among other defendants, as well as various cross and counterclaims (the Nat-West litigation).
 

 On February 5, 1993, Glenfed assigned its total secured claim of $720,000 to BII for $200,000. Michael Shields, the president and one of two stockholders of BII, is the son of Harold Shields, the president and principal of IBI. Subsequently, a controversy developed between the Trustee and BII. The Trustee believed that BII was attempting to continue IBI as a business, rather than simply waiting for the Trustee to liquidate IBI’s assets in satisfaction of the claims held by BII and other creditors. For example, BII had sent a letter to IBI’s former clients telling them, among other things, that BII had “purchased” IBI’s assets, had hired IBI’s former drivers and would operate from the same facility, and would continue to use the IBI trade name. The Trustee viewed this conduct as an actionable violation of the automatic stay, 11 U.S.C. § 362, as well as grounds for equitable subordination of BII’s claim. BII felt that its conduct was a lawful attempt to preserve the value of IBI’s assets, especially given the large size of BII’s secured claim in relation to the assets available to satisfy that claim.
 

 The Trustee and BII eventually agreed that “[t]he Trustee’s ability to recover on the Natwest litigation ... will be substantially enhanced by the full cooperation and assistance of ... BII,” and settled their dispute in ah agreement (the Settlement Agreement) approved by Bankruptcy Judge Cyganowski in September 1993. Paragraphs 11 and 12 provided for a complete cross-release of “any and all claims and causes of action of any kind or nature whatsoever” against each other. Paragraph 11 also provided that “[except for the payments to be made herein,” BII and associated individuals agreed to “withdraw any and all claims each has asserted or may assert in the bankruptcy case.”
 

 The Settlement Agreement stipulated that BII would hold a valid secured claim for $480,000. The parties arrived at this net claim amount by reducing the $720,000 secured claim BII purchased from Glenfed by $280,000 (representing the value of assets that BII had allegedly already received or appropriated), and then augmenting it by $40,000 (representing $40,000 that BII would receive from a customer for post-conversion services and then pay to the Trustee).
 

 Paragraph 5 of the Settlement Agreement provided that BII could collect IBI’s pre-petition accounts receivable (the Accounts). Subsequently, BII retained the law firm of Mangone & Schnapp
 
 [2]
 
 to collect the Accounts. The parties signed a retainer agreement (the Accounts Retainer) that listed the Accounts and made BII responsible for the fees, costs and expenses incurred in collecting the specified Accounts. The retainer
 
 *208
 
 agreement was approved by the bankruptcy court in March 1994.
 

 Finally, and most significantly for this appeal, the Settlement Agreement allocated any proceeds from the NatWest litigation (and from the Accounts) as between the Trustee and BII. Paragraph 8 provided that the “first $150,000.00 shall be paid'to BII ... [t]he next $100,000.00 ... to the estate [and][a]ll sums collected thereafter shall be paid to BII
 
 until payment in full of
 
 ...
 
 the BII Secured Claim.”
 
 (emphasis added). Paragraph 8 made no provision for the payment of fees, costs and expenses. On the apparent assumption that the NatWest litigation might yield more than enough to pay BII’s secured claim in full, the parties agreed in Paragraph 9 that
 
 “[i]n addition to payment of the BII Secured Claim,
 
 BII shall receive 25% of the net proceeds recovered in the Natwest litigation
 
 after payment of all attorneys fees, costs and
 
 expenses_” (emphasis added). While Paragraph 9 provided for the payment of fees, costs and expenses incurred in connection with the ÑatWest litigation, it did not provide for payment of fees, costs and expenses incurred in pursuing the Accounts.
 
 [3]
 

 The Trustee prosecuted the NatWest litigation, with BII’s cooperation. In August 1994, the bankruptcy judge approved a partial settlement of the NatWest litigation (the NatWest Settlement) for $375,000. The settlement provided for dismissal of all claims asserted by or against IBI, with the exception of a large remaining claim by IBI against National Westminster Bank USA and Armored Revere, Inc., for tortious interference with IBI’s business.
 

 At the same time, the Trustee sought the bankruptcy court’s permission to surcharge the NatWest Settlement proceeds under § 506(c) to pay the related fees of Goldman, Horowitz & Cherno (Counsel to the Trustee), Mangone & Sehnapp (Special Counsel), and Sandler, Rosengarten, Denis, & Berger (Accountants for the Trustee), as well as the related costs and expenses (collectively, the Expenses), before distributing the NatWest Settlement proceeds pursuant to the Settlement Agreement between BII and the Trustee.' BII generally approved of the NatWest Settlement, but ultimately took the position that it was entitled to its share of the proceeds from the NatWest Settlement without any deductions for the Expenses until its secured claim was paid in full.
 

 Judge Cyganowski held that the Settlement Agreement did not prevent the Trustee from surcharging the NatWest Settlement proceeds, and found that the Trustee had stated a valid claim under § 506(c). However, the judge allowed the Trustee to surcharge only an amount equal to half of the Expenses ($95,878.56). Under this decision, BII would receive $179,121.44 towards payment of its secured claim, as opposed to the $275,000 it claims to be entitled to under the Settlement Agreement. BII appealed, and in March 1997 Judge Spatt affirmed the bankruptcy court. This appeal followed.
 

 B. Analysis
 

 BII argues primarily that the plain language of the Settlement Agreement between BII and the Trustee compels distribution of the NatWest Settlement amount to BII free and clear of any administrative claims. BII also characterizes the $140,000 ($100,000 under Paragraph 8 and the $40,000 paid by BII) as a “carve-out” for payment of the Expenses.
 
 [4]
 
 The Trustee emphasizes that Bankruptcy Judge Cyganowski approved the Settlement Agreement in the first place and argues primarily that her findings and interpretation of that agreement and of the effect of § 506(c) are correct and certainly not clearly erroneous.
 

 Turning to the meaning of the Settlement Agreement, a party to a court-approved settlement must be able to rely on the plain language of such an agreement, at least in cases where relief from the order approving
 
 *209
 
 the settlement would be inequitable because a party has reasonably relied on the settlement and cannot be restored to its pre-settlement position. See In re Texlon Corp., 596 F.2d 1092, 1100-01 (2d Cir.1979); Feldman v. Trans-East Air, Inc., 497 F.2d 352, 355-56 (2d Cir.1974); In re James E. O’Connell Co., 893 F.2d 1072, 1074 (9th Cir.1990); In re Evanston Beauty Supply, Inc., 136 B.R. 171, 178 (Bankr.N.D.Ill.1992); In re American Resources Management Corp., 51 B.R. 713, 722 (Bankr.D.Utah 1985). Cf. In re Emergency Beacon Corp., 666 F.2d 754, 757-61 (2d Cir.1981) (allowing modification where no reasonable reliance).
 

 1. Interpretation of the Settlement Agreement
 

 The Settlement Agreement is unambiguous with regard to the allocation of the NatWest Settlement proceeds, and its terms are clearly inconsistent with the Trustee’s attempt to rely on § 506(c). It is not until BII has received “payment in full of the ... BII Secured Claim” under Paragraph 8 that Paragraph 9 provides “[i]n addition” for the “payment of all attorneys fees, costs and expenses” of the NatWest litigation before dividing up any remaining proceeds. Standing alone, Paragraph 8 specifically allocates the NatWest Settlement proceeds as between the estate and BII. When Paragraph 8 is then read in conjunction with the express provision for the payment of the Expenses in Paragraph 9, it is clear that the Settlement Agreement is flatly inconsistent with the Trustee’s attempt to deduct the Expenses from the $375,000 NatWest Settlement before BII’s claim is paid in full.
 

 The Trustee suggests that Paragraph 9 only provides for the Expenses because § 506(c) will no longer be available once BII’s secured claim has been paid in full under paragraph 8. The flaw in this argument is that the Expenses obviously need only be paid once. If the Settlement Agreement contemplated that the Expenses could be paid under § 506(c) before the remaining proceeds were applied to BII’s secured claim under Paragraph 8, there would have been no need to provide for payment of the Expenses again in Paragraph 9.
 

 The Trustee also stresses that the firm of Mangone & Schnapp is allowed to deduct its fees, costs, and expenses in collecting the Accounts. But this has no persuasive weight. The Accounts Retainer was expressly limited to the specified Accounts. Furthermore, since neither Paragraph 8 nor 9 of the Settlement Agreement provides for the payment, of expenses incurred in collecting the Accounts — Paragraph 9 refers only to the expenses of the NatWest litigation — it is hardly surprising that BII’s Accounts Retainer with Mangone & Schnapp would provide for the payment of these expenses.
 

 In addition, the broad language in Paragraph 12 of the Settlement Agreement releasing “any and all claims and causes of action of any kind or nature whatsoever” strongly suggests that any contrary interpretation of the Settlement Agreement would constitute an unfair surprise for BII.
 

 Finally, it is not necessary to decide whether the $140,000 paid to the estate should be characterized, as the Trustee suggests, as partial compensation for BII’s alleged wrongdoing, or as BII argues, as a “carve-out” for administrative expenses. Also, both parties rely on our decision in In re Flagstaff Foodservice Corp., 739 F.2d 73 (2d Cif.1984), to support their positions. But here, too, we need not deal with their arguments. On this record, the clear meaning of the Settlement Agreement governs. In sum, we believe that the text of the Settlement Agreement is simply not susceptible to the reading advanced by the Trustee and that until BII’s allowed secured claim is paid in full, BII is entitled to have the $375,000 received in partial settlement of the NatWest litigation distributed in accordance with Paragraph 8 of the Settlement Agreement: $150,000 to BII, $100,000 to the estate and the remaining $125,000 to BII.
 

 2. Relief under General Equitable Powers or Rule 9024
 

 Although we have found the meaning of the Settlement Agreement to be clear, this does not end the matter. A bankruptcy court has the power to' reverse its prior orders pursuant either to its general equitable powers or Bankruptcy Rule 9024. In the
 
 *210
 
 absence of reasonable reliance, this power has been used to modify orders approving stipulations entered into by, parties to a bankruptcy (and thus to effectively change the terms of those stipulations). • See Emergency Beacon, 666 F.2d at 757-61.
 

 In this case, however, BII has reasonably relied on the Settlement Agreement and cannot be restored to its pre-settlement position. BII and the Trustee agreed to cooperate rather than fight for control of the NatWest litigation, and arrived at a bargain that provides for the payment of the Expenses of that litigation in Paragraph 9, but does so only after Paragraph 8 has been satisfied by payment in full, of BII’s secured claim from recoveries in the NatWest Litigation and on various accounts receivable.
 

 The parties made their bargain when the outcome of the complicated NatWest litigation was uncertain. While we certainly hope that additional recovery in the NatWest litigation will allow for the payment of all of the Expenses, it would not be equitable to rewrite the Settlement Agreement now that the NatWest litigation has at least partially been resolved and various claims against the NatWest defendants that BII may have succeeded to by purchasing the Glenfed claim have been released. Such a course would also be unwise, since it might well have a damaging effect on future creditors’ willingness to compromise claims and cooperate with the bankruptcy process.
 

 We have considered all of the arguments made by the Trustee. We reverse the order of the district court and remand with instructions to allocate the NatWest Settlement proceeds in accordance with the Settlement Agreement, as set forth above.
 

 [1]
 

 . Section 506(c) provides:
 

 The trustee may recover from property securing an allowed secured claim the reasonable,
 
 *207
 
 necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.
 

 [2]
 

 . Mangone & Schnapp represented IBI in the NatWest litigation during the Chapter 11 case. To date, Mangone & Schnapp has been paid only a small amount on its allowed claims for $187,-882.70 in fees from that stage of this bankruptcy. After the conversion to Chapter 7, Mangone & Schnapp continued to pursue the NatWest litigation as Special Counsel to the Trustee.
 

 [3]
 

 . As indicated above, payment of these sums was provided for in a subsequent retainer agreement with Mangone & Sehnapp.
 

 [4]
 

 . A "carve-out” is an agreement by a creditor-holding a secured or super-priority claim to earmark funds for the payment of estate professionals whose claims would ordinarily be of a lower priority. See 3 Collier on Bankruptcy ¶ 364.04[2][d] (Lawrence P. King ed., 15th ed. rev. 1997).