**In re EES LAMBERT ASSOCIATES, a Limited Partnership, Debtor.**

**Bankruptcy No. 84B591.**

United States Bankruptcy Court, N.D. Illinois, E.D.

June 5, 1986.

Brian Meltzer, Schwartz & Freeman, David Missner, Schwartz, Cooper, Kolb & Gaynor, Chartered, Chicago, Ill., for debtor.

Anton R. Valukas, U.S. Atty., Eileen M. Marutzky, Asst. U.S. Atty., John H. Mahoney, Department of Housing and Urban Development, Chicago, Ill., for HUD.

Dean Harvalis, Chicago, Ill., trustee.

## MEMORANDUM OPINION AND ORDER AS TO ALLOWANCE OF INTERIM COMPENSATION OF ATTORNEYS AND ACCOUNTANTS

JACK B. SCHMETTERER, Bankruptcy Judge.

Presently before the court is the Application of counsel for Chapter 11 debtor EES Lambert Associates ("Lambert") for payment of interim compensation. Such Application was met by the strenuous objection of the United States Department of Housing and Urban Development (HUD), whose cash collateral must be used if the fees are paid from this estate. For the reasons set forth below the request for interim compensation will be granted in part and denied in part, with further hearings ordered as to the reasonableness and timing of payment of fees to be allowed, and amount of adequate protection payments and other possible requirements to be imposed as a condition thereof.

Also before the court is the application of David Dahl of the accounting firm of Leaf, Dahl, and Company, Ltd. for accounting services. It is not opposed by HUD or any other party, and will be allowed.

### Factual and Procedural Background

Lambert, an Illinois limited partnership, owns and operates a 12 building 286 unit apartment complex in Justice, Illinois.[1] HUD is presently the holder of a perfected first mortgage on the project and the debtor's sole secured creditor.[2] The mortgage has been in default since March of 1981. HUD obtained a decree of foreclosure and sale from the United States District Court, *United States v. Am. Nat. Bank & Trust Co. of Chicago*, 595 F.Supp. 324 (N.D.Ill. 1983), which the Seventh Circuit affirmed, 727 F.2d 1112 (7th Cir.1984).[3] HUD was then allowed to proceed with the foreclosure sale previously scheduled for January 18, 1984 but Lambert filed its chapter 11 petition on January 17, 1984. Lambert says it had no choice but to seek the protection of the bankruptcy laws after a fire destroyed 23 units and it was unable to negotiate a mortgage modification with HUD.

On April 10, 1984, HUD moved to modify the automatic stay so as to complete the foreclosure of its mortgage. That motion was denied, but with provision for adequate protection payments. Under the terms of the adequate protection order entered June 15, 1984, Lambert is to pay HUD $49,698.35 per month. Should it fail to do so on or before the 10th day of any

---

1. On December 18, 1983, a fire destroyed one building containing 23 units.

2. Lambert is not the original mortgagor. In 1971 American National Bank and Trust Company of Chicago a/t/u/t No. 785501001 borrowed $4,594,100 from Bell Federal Savings and Loan Association to build the Lambert Quarter Apartments. The original beneficiary was the Illinois limited partnership EES Hickory Associates comprised of 3 general partners and 19 limited partners. In 1975 after difficulties with Walter Kassuba, a general partner, EES Lambert was formed with Vincent Donile, a turnaround specialist, as general partner and the same 19 limited partners. Lambert became suc-

cessor beneficiary under the American National Bank trust, assumed the mortgage and executed a regulatory agreement. The mortgage was insured by HUD. After default in March of 1981, HUD paid Bell Federal over $4 million from its insurance fund and the mortgage, note and ancillary documents including the regulatory agreement were assigned to HUD.

3. The district court found as of August 31, 1983, that Lambert's unaccelerated default on the mortgage was $1,104,443.10. *United States v. Am. Nat. Bank & Trust Co. of Chicago*, 595 F.Supp. 324, 324–325 (N.D.Ill.1983) *aff'd.*, 727 F.2d 1112 (7th Cir.1984).

month, the stay will be modified so that HUD may foreclose its mortgage. Lambert claims that it has made all the required adequate protection payments to HUD since that order was entered, and has filed the required operating statements. Lambert Response to Government's Objections to Interim Attorneys' Fees, at 3. As of December 23, 1985, however, HUD says it is not receiving adequate protection payments, and that it was advised by debtor's counsel that the payment due December 10, 1985, "has not been made and will not be made". Government's Supplemental Opposition to Debtor's Application for Interim Attorneys' Fees, at 10 n. 2. The debtor's Monthly Operating Report for December, 1985, filed March 4, 1986, does not include a $49,698.35 payment to HUD. The Monthly Report for September, 1985, filed February 13, 1986, also does not include an adequate protection payment to HUD. Lambert has not filed any monthly reports for 1986. Clearly, before considering adequate protection for use of cash collateral, this court must require a hearing with evidence to verify or negate the requisite payments and reports. Should violations of the earlier order be demonstrated a renewed application by HUD to modify stay will certainly be entertained.

Although this case has been pending for over two years, the U.S. Trustee alleges that Lambert has not filed or proposed a plan of reorganization or disclosure statement. Lambert has obtained numerous extensions of time to file its plan through and including April 15, 1985. On May 8, 1986, the United States Trustee moved to dismiss this case for Lambert's failure to file a plan as ordered by the court. That motion is still pending, and is set for hearing on June 9, 1986 at 10:30 A.M.

Prior activity in this case has particular relevance to the present application for fees. At the time HUD moved to modify the stay, it also moved for entry of an order compelling Lambert to restore im-

properly diverted funds (consisting of legal fees paid to its counsel) to the estate, and to segregate and account for all income from the project. On October 29, 1984, that motion to restore funds was granted and the motion for segregation denied. See *In Re EES Lambert Associates*, 43 B.R. 689 (Bankr.N.D.Ill.1984) *aff'd.*, 63 B.R. 174 (N.D.Ill. 1986) for particulars.[4]

Lambert had paid the law firm Hannafan & Handler $20,500 to defend the HUD foreclosure and the firm Schwartz & Freeman $25,000 as a retainer for the chapter 11 proceedings. Those fees were paid from project income. HUD objected that those payments violated the terms of the regulatory agreement Lambert was required to execute and which is a part of the mortgage documents. That agreement prohibits the use of project income when there is a default, except to pay reasonable operating expenses and necessary repairs unless HUD consents. *See also, In Re EES Lambert Associates*, 43 B.R. at 690, for the particulars of the regulatory agreement. The court agreed that Lambert was liable for the fees unless they were reasonable operating expenses, and found they were not. *EES Lambert Associates*, 43 B.R. at 689–91.

The court relied upon *United States v. Frank*, 587 F.2d 924 (8th Cir.1978) and *Thompson v. United States*, 408 F.2d 1075 (8th Cir.1969). It concluded that reasonable operating expenses "are expenses arising from the everyday operation and maintenance of the project." *EES Lambert Associates*, 43 B.R. at 691. The term could not be construed to include attorneys fees which were expended to keep the partnership in a position to operate the project, they were a personal expense of the investors. *EES Lambert Associates*, 43 B.R. at 691. Lambert was ordered to restore the $45,500 to the debtor's estate. On March 16, 1986, Judge Decker of our district court affirmed that decision. *In Re EES Lam-*

4. *In Re EES Lambert Associates,* 43 B.R. 689 (Bankr.N.D.Ill.1984) is the Memorandum Opinion of the Honorable Thomas James, retired bankruptcy judge, recommended by him for entry by the Honorable Robert D. Martin, bankruptcy judge.

*bert Associates,* 63 B.R. 174 (N.D.Ill. 1986). He found, "[t]he bankruptcy court, thus, properly considered the foreclosure and bankruptcy fees in the same light, concluding that neither were operating expenses. ... Again the essential distinction is between expenses necessary for the ongoing operation of the project and those necessary to protect the investors. The former may be paid out of project funds while the mortgage is in default. The latter may not."[5] *In Re EES Lambert Associates,* at 176.

It should also be noted that the bankruptcy court denied HUD's motion to segregate project income. This issue was not appealed. The court specifically found that income generated from the operation of the project constituted cash collateral as defined by § 363 of the Bankruptcy Code, Title 11 U.S.C. § 363. However, it found that segregation of project income exceeding operating expenses was not required because HUD was adequately protected by monthly payments and the ongoing disclosure to HUD of receipts and disbursements. *In Re EES Lambert Associates,* 43 B.R. at 691–92.

### The Fee Requests

On July 15, 1985, Brian Meltzer of the law firm Schwartz & Freeman, and David Dahl of the accounting firm Leaf, Dahl and Company, Ltd., presented their applications for interim compensation. HUD has consented to payment of Mr. Dahl's request of $5,650 for services rendered in connection with the 1984 audit, a HUD-required purpose. Schwartz & Freeman, as noted, was originally retained to represent Lambert in the chapter 11 case and its pre-petition

retainer of $25,000 was ordered restored to the estate. HUD interposed its objections to Mr. Meltzer's current request for $71,-319.39 and expense reimbursement of $1,547.49, less (it says) the "$20,000" retainer previously received and not yet restored, for a total of $52,866.88. However, since the original retainer was $25,000,[6] the correct net amount now sought is only $47,-866.88.

HUD filed, (i) Government's Opposition to Interim Attorney's Fees (September 16, 1985), (ii) HUD's Response to the Reasonableness of Attorney's Fees (November 6, 1985), (iii) HUD's Reply to Interim Attorney's Fees (November 13, 1985), and (iv) Government's Supplemental Opposition to Debtor's Application For Interim Fees (December 23, 1985). Lambert filed, (i) EES Lambert Associates' Response to the Government's Objections to Interim Attorney's Fees (September 25, 1985), and (ii) EES Lambert Associates' Supplemental Authority In Support of its Application for Interim Fees (December 2, 1985). As requested by this court, Schwartz Cooper Kolb & Gaynor has filed on behalf of Brian Meltzer of Schwartz & Freeman, (i) Supplement to Application for Interim Compensation for Attorney's Fees for Debtor and Debtor-In-Possession (August 27, 1985), and (ii) Supplement to Application for Interim Compensation for Attorneys and Accountants for Debtor and Debtor-In-Possession (October 23, 1985).

It is not necessary to include here a detailed description of legal services asserted in the fee application and two supplements thereto, nor to repeat here HUD's many objections to the value and reasonableness of the services. This Opinion is limited to determining whether or not the debtor has the right to pay those attorneys

---

**5.** Two other judges of this bankruptcy court have considered this question. In accord with the district and bankruptcy courts in *EES Lambert Associates,* they concluded that while a HUD insured mortgage is in default project income may not be used to pay attorney fees to defend foreclosure by HUD or to retain counsel for a chapter 11 proceeding. *In Re Hillcrest Apartments,* 50 B.R. 610 (Bankr.N.D.Ill.1985) (Eisen, B.J.); *In Re Michigan Beach Apartments,* 61 B.R. 446 (Bankr.N.D.Ill.1986) (Schwartz,

B.J.); and *In Re TWO–KMF Development Association,* 63 B.R. 149 (Bankr.N.D.Ill. 1985) (Schwartz, B.J.).

**6.** HUD accurately notes that debtor paid Schwartz & Freeman a $25,000 retainer. *In Re EES Lambert Associates,* NO. 84 B 591 (Bankr. N.D.Ill.) (Disclosure of Compensation filed, Jan. 18, 1984). Thus, the correct request should be for $47,866.88.

fees from the income of Lambert Quarter, and hearing as to amounts claimed has been set hereinbelow for evidence hearing. Therefore, for purposes of this Memorandum Opinion, the court will adopt HUD's categorization of the services rendered by Schwartz & Freeman and assign to them the dollar amounts set forth in the supplement to the fee application submitted on behalf of Mr. Meltzer. This is only an approximation, and is subject to the evidenciary hearing to be held as ordered hereinbelow:

1. *Representation of Lambert as Debtor and Debtor-In-Possession* ($36,000) This category includes conferring with and representing the debtor with regard to its financial problems, the status of its assets and liabilities, the possibility and advisability of chapter 11, preparing the petition and other court documents, court appearances and proceedings, and attempting a workout with HUD to modify the mortgage.

2. *Proposed sale of Lambert Quarter* ($16,000) Negotiating sale agreements with prospective purchases and mortgage modification with HUD, etc.

3. *The Fire* [7] ($15,000) Negotiating insurance settlement, proposed modification of mortgage, negotiations with the public adjustor and Village of Justice.

4. *Taxes* ($4,000) Avery, Hodes, Costello & Burman was retained by debtor as special counsel to reduce 1983 real estate taxes and was successful. However, effort was made by Schwartz & Freeman and Arvey Hodes to reduce 1984 taxes and 1985 assessment.

### The HUD Regulatory Agreement is Binding Upon Lambert as a Debtor-In-Possession

Several of the Lambert arguments must be disposed of at the outset. It contends that the present fee application differs from the last because we are now post-petition; that after a mortgagor files bankruptcy, the HUD regulatory agreement is no longer controlling authority, but rather the Bankruptcy Code is, and it permits a debtor-in-possession to pay its attorneys fees. Moreover, to deny Lambert the assistance of counsel is to effectively deny its Constitutional right to reorganize.

 Lambert indeed generally has the right to avail itself of the purposes of a business reorganization under chapter 11 of the Bankruptcy Code; to relieve itself of its prepetition debts; and ultimately to restructure its business so it may continue to operate, provide its employees with jobs, and produce a return for its investors. *In Re American Mariner Industries*, 734 F.2d 426, 431 (9th Cir.1984) *quoting* H.R. Rep. No. 595, 95th Cong.2d Sess. 220 *reprinted in*, 1978 U.S. Code Cong. & Ad News 6179. And the court agrees that a governmental unit such as HUD is bound by the provisions of the Bankruptcy Code, including § 363 governing the use of cash collateral, to the same extent as any other secured creditor. *In Re Martin*, 761 F.2d 472, 478 (8th Cir.1985). However, Lambert mischaracterizes the issue. The question is not whether it has the right to reorganize, but whether it has the right to do so at HUD's expense in the light of HUD's secured position.

Should it be necessary that the partners of Lambert must individually fund the reorganization effort in order to protect their investment,[8] that would not impair any rights of Constitutional magnitude. "There is no constitutional right to obtain a discharge of ones debts in bankruptcy." *United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973). Certainly there is none that requires the

---

7. *See* note 1 *supra*.

8. This is exactly what Judge Schwartz suggested be done in *In Re Michigan Beach Apartments*, 61 B.R. 446, 449–50, 450. "Since the reorganiza-

tion benefits the debtor rather than the Project, the general partner of the debtor should be required to pay the debtors attorneys' fees (the retainer for chapter 11 counsel). *Id.* at 450.

Government pay for that discharge when "[t]he Government never guaranteed the partnership that the [Lambert Quarter] operation would be successful or profitable, and the Government never assumed the risk of loss should the project fail, except that the Government was willing to insure a loan which had for its security only the property itself, there being no personal recourse against the borrower." *United States v. Thompson*, 272 F.Supp. 774, 787 (E.D.Ark.1967) *aff'd.*, 408 F.2d 1075 (8th Cir.1969). Indeed, it is hardly uncommon in the world of commercial activity that individuals fund their own legal expenses in order to protect their investments.

The note and mortgage were attached as exhibits to HUD's Memorandum in Support of its Motion to Modify Stay filed April 10, 1984, and the execution and terms thereof were never denied. The mortgage expressly provides:

> ... that the Regulatory Agreement, if any, executed by the Mortgagor and the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Mortgage. Upon default under the Regulatory Agreement and upon request of the Federal Housing Commission, the Mortgagee at its option, may declare the whole of the indebtedness secured hereby to due and payable.

Both the note and mortgage set forth the nonrecourse nature of the mortgage loan made to American National Bank & Trust Company of Chicago, not individually but as trustee under the trust of which Lambert is successary beneficiary. The trustee's monetary liability is limited to "funds or property of the project coming into its hands which, by the provisions of the regulatory agreement, it is not entitled to re-

tain." The regulatory Agreement was attached as an exhibit to the Government's Opposition to Interim Attorneys Fees, and the Court understands that there is no dispute as to its execution and terms. That agreement similarly limits the personal liability of the project owners at paragraph 17:

> The following Owners do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements or for matters not under their control, provide that said owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; ...
>
> (a) for funds or property coming into their hands which, by the provisions hereof, they are not entitled to retain; and
>
> (b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

The provision of the regulatory Agreement that has proved so troublesome for Lambert is 6(b):

> Owners shall not without the prior written approval of the Secretary: Assign, transfer, dispose of, or encumber any personal property of the project, including rents or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

Unfortunately for Lambert, "No surplus cash has been available for EES Lambert's use because it has been in default on its mortgage payments since March of 1981...."[9] *In Re EES Lambert Associates*, 43 B.R. at 690. Since the attorney fees paid as pre-petition retainer were not

---

**9.** The regulatory Agreement defines surplus cash as:

3(f) "Surplus Cash" means any cash remaining after:

(1) the payment of:

 (i) All sums due or currently required to be paid under the terms of any mortgage or note insured by the Secretary.

 (ii) All amounts required to be deposited in the reserve fund for replacements.

 (iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregation of:

 (i) An amount equal to the aggregate of all special funds required to be maintained by the project;

 (ii) All tenant security deposits held.

reasonable operating expenses under the foregoing provisions of the regulatory Agreement, the Lambert partnership was liable for those payments. *In Re EES Lambert Associates*, 43 B.R. at 690.

■ The note, mortgage and regulatory Agreement for multi-family projects of this type make up the loan documents Lambert assumed. They constitute one interdependent contractual obligation. The restrictions imposed by the regulatory Agreement on the use of project income were part and parcel of the financing for the acquisition of the apartments, particularly in light of the waiver of personal liability on the note. *In Re EES Lambert Associates*, 43 B.R. at 690, 691. Lambert cannot simply file a bankruptcy petition and then relieve itself of the strictures of its regulatory Agreement with HUD.

■ A debtor's ability to rid itself post-petition of a contractual undertaking that it considers burdensome is contained in, and limited by, § 365 of the Code, which permits that debtor to assume or reject any *executory* contract. 11 U.S.C. § 365(a); *see also*, 11 U.S.C. § 1123(b)(2). The note, mortgage, and regulatory Agreement are not executory contracts that Lambert may assume or reject at its election. A contract may be rejected only if it is "executory," which requires that performance remain due on both sides; *Gloria Mfg. v. Intern Ladies' Garment Workers*, 734 F.2d 1020, 1021–22 (4th Cir.1984). A promissory note and mortgage on real property are not executory contracts. *In Re Texstone Venture Ltd.*, 54 B.R. 54, 56 (Bankr.S.D.Texas 1985) (promissory note); *and, Matter of North American Dealer Group, Inc.*, 16 B.R. 996, 998–1000 (Bankr.E.D.N.Y.1982). *See also In Re TWO–KMF Development Association*, 63 B.R. 149, 150 (Bankr. N.D.Ill. 1985) (where a similar HUD insured multi-family project was held to remain subject to the note, mortgage and regulatory to the note, mortgage and regulatory Agreement after filing of bankruptcy). Even if one or more parts of this financing transaction could separately be considered executory, Lambert could not assume the note and mortgage, make provision for curing the default and providing adequate assurance of its future performance, and then simply reject the regulatory Agreement. A debtor cannot retain those aspects of the contract to his benefit while rejecting the burdensome aspects thereof. An assumed contract under Section 365 "is accompanied by all of its provisions and conditions." *In Re Texstone Ventures, Ltd., supra*, 54 B.R. at 56. Accordingly, Lambert cannot reject the regulatory Agreement, note, or mortgage.

■ However expansive the bankruptcy court's power may be to protect the property interests of debtors-in-possession, it does not extend to enlarging the rights of a debtor under a contract or rewriting its terms. *In Re Bolin Oil, Co.*, 51 B.R. 936, 938 (Bankr.N.D.Ohio 1985) *and, Matter of Lauderdale Motorcar Corp.*, 35 B.R. 544, 548–49 (Bankr.S.D.Fla.1983). The regulatory Agreement HUD required of Lambert is not some slight contractual undertaking that can be circumvented by the filing of a bankruptcy petition. "The Congressional intent is to prevent money of federally insured housing projects from being diverted to purposes other than actual and necessary expenses when the mortgage is in default." *United States v. Norris*, 749 F.2d 1116, 1120 (4th Cir.1984).

■ This court is in full agreement with the prior determination that reasonable operating expenses "are expenses arising from the every day operation and maintenance of the project;" that the legal fees Lambert previously paid Schwartz & Freeman as retainer for services in connection with this Chapter 11 "were not necessary or incidental to the everyday operation [of the project] and are not operating expenses;" and that after default Lambert could not pay those or similar fees from project income. *In Re EES Lambert Associates*, 43 B.R. at 691.

In determining whether Mr. Meltzer's present request stands in any different light and may be properly paid from project income, the guiding tenet remains the same: "A proper construction of this provi-

sion [of the regulatory agreement] requires distinguishing expenses incurred primarily on behalf of the personal interests of the investors from those related to the every day operation of the enterprise." *United States v. Frank,* 587 F.2d 924, 927 (8th Cir.1978); *accord Thompson v. United States,* 408 F.2d 1075, 1079–81 (8th Cir. 1969); *In Re EES Lambert Associates,* 63 B.R. 174 (N.D.Ill.1986); *In Re EES Lambert Associates,* 43 B.R. at 690–91.

■ Payment of attorney fees is likely to prolong the debtor's management of a project and preserve debtor's ability to reap continued tax benefits from investments in that project. Since the primary benefits resulting from payment of such attorneys' fees accrue to the debtor rather than to the project and the project's tenants, those costs should ordinarily be paid by the debtor's general partner rather than from HUD's cash collateral. *In Re Michigan Beach Apartments,* 61 B.R. 446, 449–50 (Bankr.N.D.Ill.1986) (Judge Schwartz).

### The Extent of the Government's Interest And Its Rights As Secured Party

■ "EES Lambert's permission to collect and retain rents, profits and income from the apartments terminated on default. HUD as assignee could exercise its right to apply all project income to discharge the mortgage loan." *In Re EES Lambert Associates,* 43 B.R. at 691; *accord, United States v. American Nat. Bank & Trust Co.,* 573 F.Supp. 1319, 1322–23 (N.D.Ill. 1983). After commencement of this Chapter 11 case, the rents and other income generated by Lambert Quarter became cash collateral as defined by § 363(a) of the Bankruptcy Code.[10] Section 363(c)(2) provides:

> (2) The trustee may not use, sell or lease cash collateral under paragraph (1) of this subsection unless—
>
> > (A) each entity that has an interest in such cash collateral consents; or
> >
> > (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

Subsection 363(e) further provides:

> (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

Section 363 applies to all entities that have an interest in the debtor's estate, including governmental units such as HUD. *In Re Martin,* 761 F.2d 472, 478 (8th Cir.1985). Therefore its cash collateral is subject to use by a debtor-in-possession when the provisions of § 363 are met to the same extent as any other secured creditor.

■ The court may award to debtor's attorney reasonable compensation for necessary services rendered and also reimbursement for actual necessary expenses. 11 U.S.C. § 330(a)(1), (2). The compensation and reimbursement awarded an attorney under § 330 is an administrative expense of the debtor's estate, 11 U.S.C. § 503(b)(2), and is generally accorded first

---

**10.** "Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

The HUD mortgage and regulatory Agreement gave it the requisite "interest" in such Lambert properties. The mortgage provides that all rents, profits and income from the property covered by this mortgage were assigned to Mortgagee for the purpose of discharging the debt thereby secured. Permission was given to Mortgagor (so long as no default existed) to collect such rents, profits and income for use in accordance with the provisions of the Regulatory Agreement.

priority by § 507(a)(1) of the Bankruptcy Code.

 "Compensation is the lubricant which makes the bankruptcy machinery work when applied in the proper places in the proper amount." *Matter of King Resources Co.,* 651 F.2d 1349, 1352 (10th Cir.) *cert. denied sub nom. Citibank, N.A. v. Phoenix Resources Co.,* 454 U.S. 881, 102 S.Ct. 370, 70 L.Ed.2d 195 (1981). However, "[t]raditionally administrative expenses have not been charged against secured creditors." *Matter of Trim-X, Inc.,* 695 F.2d 296, 301 (7th Cir.1982). "As a general rule, expenses of administration must be satisfied from assets of the estate not subject to liens." *In Re American Resources Management Corp.,* 51 B.R. 713, 719 (Bankr.D.Utah 1985). Should this debtor's estate have no unencumbered funds, that fact would not obligate HUD as secured creditor to finance a chapter 11 proceeding except to the limited extent provided by 11 U.S.C. § 506(c),[11] unless that creditor consents. *In Re Bob Grissett Golf Shoppes, Inc.,* 50 B.R. 598, 604 (Bankr.E.D.Va.1985); *accord In Re S & S Industries, Inc.,* 30 B.R. 395, 397 (Bankr.E.D.Mich.1983).

 On the other hand, the fact that funds are cash collateral does not by itself entitle the creditor to possession of those funds in a Chapter 11 proceeding. *In Re Little Puffer Billy, Inc.,* 16 B.R. 174, 175 (Bankr.D.Or.1981). Indeed, the fact that an award of interim compensation would be paid from a creditor's cash collateral has been held not by itself to constitute grounds to deny an award of interim compensation. *Matter of Georgia Steel, Inc.,*

19 B.R. 834, 837 (Bankr.M.D.Ga.1982); *accord, In Re Callister,* 15 B.R. 521 (Bankr. D.Utah 1981), *aff'd., appeal dismissed,* 673 F.2d 305 (10th Cir.1982), 13 Bankr.Ct.Dec. (CRR) 21 (10th Cir.1984).

In *Callister, supra,* a creditor enjoying a superpriority under 11 U.S.C. § 507(b)[12] opposed applications for interim compensation and expenses sought by counsel for the debtor and unsecured creditors committee. It was held those sums could be allowed, but not paid, until creditor's superpriority claim was first satisfied. *In Re Callister,* 15 B.R. at 523, 534. That court found a presumption that attorney's fees will be paid notwithstanding the existence of a superpriority claim, although not in every instance must attorney's fees be paid ahead of superpriority creditors. Fee claimants contribute to the debtor's reorganization. Were the superpriority claimant to preempt their fees, that would jeopardize the future rendition of such services. *In Re Callister,* 15 B.R. at 534–535.[13]

In *Matter of Georgia Steel,* 19 B.R. 834 (Bankr.M.D.Ga.1982) the court considered whether interim compensation and expense reimbursement could be paid from cash collateral in which three secured creditors had an interest. *Matter of Georgia Steel,* 19 B.R. at 835, 836. The court overruled the creditors' objections, *Matter of Georgia Steel,* 19 B.R. at 837. It found those creditors to be adequately protected. If that protection proved inadequate and superpriority claims were allowed, an award of interim compensation could still be made

---

**11.** 11 U.S.C. § 506(c) provides:
(c) The Trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.
*See also, Matter of Trim-X, Inc.,* 695 F.2d 296 (7th Cir.1986) for a discussion of § 506(c).

**12.** 11 U.S.C. § 507(b) provides:
(b) If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim

allowable under subsection [507]a(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under Section 363 of this title or from the granting of a lien under Section 346(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim under such subsection.

**13.** However, it should be noted that in *Callister* the debtor had over $300,000 in unencumbered assets from which to pay administrative expenses. *In Re Callister,* 15 B.R. at 523 n. 7.

under appropriate circumstances. *Matter of Georgia Steel*, 19 B.R. at 837.

A contrary view was taken by the Second Circuit in *In Re Flagstaff Food Service Corp.*, 739 F.2d 73 (2d. Cir.1984). General Electric Credit Corporation (GECC), an undersecured, superpriority creditor appealed an order awarding payment of interim compensation from assets it had a security interest in. The court held that GECC's security interest had priority over attorneys' claims for professional services. *In Re Flagstaff*, 739 F.2d at 75. "[A]ny fees payable from GECC's collateral must be for services which were for the benefit of GECC rather than the debtor or other creditors." *In Re Flagstaff*, 739 F.2d at 75. Section 506(c) makes provision for such allowances. "[I]f expenses for the preservation or disposition of property are incurred primarily for the benefit of a creditor holding a security interest in the property, such expenses, properly identified, may be charged against the secured creditor." *In Re Flagstaff*, 739 F.2d at 76 *citing, Matter of Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir.1982). Moreover, the fee claimants had the burden of proving that administrative expenses for which they sought compensation were within the ambit of § 506(c). *In Re Flagstaff*, 739 F.2d at 77.

The Second Circuit expressly declined to follow *In Re Callister, supra.* "[K]nowledgeable bankruptcy attorneys must be aware that the priority ordinarily given to administration expenses may 'prove illusive in light of the various provisions in the Code for competing or super-priorities.'" *In Re Flagstaff*, 739 F.2d at 75 *quoting*, 2 Collier on Bankruptcy ¶ 364.02 (15th ed. 1984). "[A] secured creditor may consent to bearing the costs of professional fees incurred by a debtor-in-possession, [but] 'such consent is not to be lightly inferred.'" *In Re Flagstaff*, 739 F.2d at 77 *quoting, In Re S & S Industries, Inc.*, 30 B.R. 395, 398 (Bankr.E.D.Mich.1983). "Although it has been well said that 'professionals should not be expected to finance the administration of liquidation or reorganization cases,' . . ., 'it does not follow that in the event the estate has no unencum-

bered assets from which to pay such expenses, the secured creditor becomes obligated to satisfy these obligations'. . . . Saddling unconsenting secured creditors with professional fees . . . would discourage those creditors from supporting debtor's reorganization efforts." *In Re Flagstaff*, 739 F.2d at 77 (citations omitted).

The court in *In Re American Resources Management Corp.*, 51 B.R. 713 (Bankr.D. Utah 1985), also considered the award of professional fees from property subject to a creditor's security interest and superpriority claim. The court was of the opinion that *Flagstaff* and *Callister supra* are not inconsistent because *Callister* does not mandate professional interim fees being paid ahead of creditor's superpriority claim, but instead creates a rebuttable presumption in favor of payment. *In Re American Resources Management*, 51 B.R. at 719. That court held its discretion to permit payment of professional fees is restricted by the existence—present or prospective—of unencumbered assets which exceeds any superpriority claims. *In Re American Resources Management*, 51 B.R. at 722. "Post-petition attorneys and accountant fees are administrative expenses and may not be given priority over existing liens and superpriority claims. *In Re American Resources Management*, 51 B.R. at 719. Unless there is equity in the collateral, administrative claimants cannot look to a creditor's encumbered property to provide a source of payment for their claims. *In Re American Resources Management*, 51 B.R. at 719. There were no unencumbered assets in that case and the court stated professional fees should be paid ahead of superpriority claim only when the superior claim is fully protected. *In Re American Resources Management*, 51 B.R. at 720.

The creditor in that case had agreed to permit a limited amount of its cash collateral to be used for payment of professional fees and the court ordered payment in accordance with the creditor's consent. *In Re American Resources Management*, 51 B.R. at 716, 722. The court also held a secured creditor may selectively waive its

liens and superpriority claims to permit payment of certain administrative expense but not others. *In Re American Resources Management*, 51 B.R. at 722.

The Seventh Circuit has not considered to what extent professional fees may be paid from encumbered collateral. It has, however, determined to what extent recovery may be had from a secured creditor under § 506(c). In *Matter of Trim-X, Inc.*, 695 F.2d 296 (7th Cir.1982), the trustee sought reimbursement from a secured creditor for expenses he incurred in preserving assets which he subsequently abandoned. The court stated "[t]raditionally administrative expenses have not been charged against secured creditors.... An exception to that general rule has been recognized when expenses of preservation are incurred primarily for the benefit of the secured creditor or where the creditor caused or consented to such expenses." *Matter of Trim-X*, at 301.

The court also found the value of the assets and the secured creditor's claim are not determinative factors in a § 506(c) analysis.

> *Any time* the trustee or debtor-in-possession expends money to provide for the reasonable and necessary cost and expense of preserving ... a secured creditor's collateral, the trustee or debtor-in-possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.

*Matter of Trim-X*, 695 F.2d at 290 (emphasis in original) *quoting*, 124 Cong.Rec. H.11089 (Sept. 28, 1978) *reprinted in* 1978 U.S. Code Cong & Ad News 6436, 6451 (statement of Rep. Edwards); 124 Cong. Rec. S17406, *reprinted in*, 1978 U.S. Code Cong & Ad News 6505, 6520 (Statement of Sen. DeConcini). The court found three criteria to be met before an administrative expense may be charged to a secured creditor under § 506(c): the expense must be necessary; it must benefit the secured creditor; and it must be reasonable. *Matter of Trim-X*, 695 F.2d at 299. *See also,*

*In Re Bob Grissett Golf Shoppes, Inc.*, 50 B.R. 598, 602 (Bankr.E.D.Va.1985).

The analysis of *Matter of Trim-X* was held applicable to the payment of professional fees from a secured creditor's collateral by the Second Circuit in *In Re Flagstaff*, 739 F.2d 73 (2d Cir.1984), discussed *supra*, which holds such payments are proper only when they are for the benefit of the secured creditor.

In the light of *Trim-X*, this Court concludes that the reasoning of *Flagstaff* should be followed rather than that of *Callister*. Indeed, given the facts in *Callister* and availability of encumbered assets to pay fees (fn. 13 hereinabove) the result in *Callister* would be the same under the other authority.

Accordingly, apart from the regulatory Agreement which permits Lambert's use of project income to expenditures for reasonable operating expenses and necessary repairs, Lambert may use HUD's cash collateral to pay its attorney fees only if (i) HUD consents (which it does not), (ii) the services benefit HUD and can be charged against it under § 506(c), or (iii) there are unencumbered assets (discussed pp. 28–9 below), *and* (iv) the court finds as permitted by § 363(e) that HUD's interest in the cash collateral to be used is adequately protected. Those elements are discussed below beginning at p. 341.

*Legal Services Which Constituted Operating Expenses and Benefited HUD will be Allowed*

Lambert has the right under the Agreement to compensate its attorneys from HUD's cash collateral for two categories of legal services performed here: services relating to the fire that destroyed one building, and services related to reducing the real estate taxes and assessments for the project. Compensation for those legal services may be allowed to the extent they are both necessary and reasonable in amount.

The regulatory agreement permits payment of such fees from project income. It is recognized that a multi-family project

may require the services of counsel in the course of its day to day operation to evict tenants, collect delinquent rents, or prosecute and defend lawsuits arising out of the operation of the project. These types of legal services are properly characterized as operating expenses of the project. *United States v. Thompson*, 272 F.Supp. 774, 789 (E.D.Ark.1967) *aff'd*, 408 F.2d 1075 (8th Cir.1969); *accord In Re EES Lambert Associates*, 43 B.R. at 691. It is the character and purpose of the payment that determine if it may be considered an operating expense. *In Re EES Lambert Associates*, 43 B.R. at 691.

The services that Schwartz & Freeman rendered to the Lambert partnership in connection with the fire on the premises, the insurance settlement and the projects real estate taxes were not performed "so that the partnership would remain in a position to operate the project." *In Re EES Lambert Associates*, 43 B.R. at 691. To the extent they were reasonable, necessary and not duplicative, they are expenses that arose from the operation of Lambert Quarter and can be properly characterized as operating expenses.

HUD does not object to payment of "conventional legal expenses" of this type. It recognizes services relating to the fire and real estate taxes could be reimburseable. HUD does, however, have objection to their payment from project income due to the insufficiency of documentation, the inadequacy of the applications to determine the reasonableness of the fees and asserted duplication of effort. HUD says it has already paid for these services. "The insurance adjuster was paid $24,789.53 for services in connection with the "Fire". [The law firm] Arvey Hodes was paid $73,500 in connection with the real estate taxes." HUD's Response to the Reasonableness of Attorney's Fees at 3 n. 7.

Of course the court will not award Schwartz & Freeman interim compensation for services relating to the fire and real estate taxes unless and until it meets HUD's objections and establishes to the court's satisfaction that the services were reasonable and necessary. Only those legal services that were necessary, of benefit to HUD, and reasonable in amount can appropriately be charged to HUD's collateral. *Matter of Trim-X*, 695 F.2d 296, 299 (7th Cir.1982). But to the extent Schwartz & Freeman did perform valuable nonduplicative legal services that were necessitated by the operation of Lambert Quarter as a going concern, such expenses are operating expenses within the meaning of the regulatory agreement and an actual necessary cost and expense of preserving this estate. As such they are administrative expenses that can be recovered from HUD's collateral. See 11 U.S.C. §§ 503(b)(1)(A), 506(c); *Matter of Jartran*, 732 F.2d 584, 587 (7th Cir.1984); *Matter of Trim-X*, 695 F.2d at 299.

### The Remaining Fees and The Issue of Adequate Protection

█ The remaining attorneys fees for representation of Lambert as a debtor before this court and to effectuate a sale of Lambert Quarter are not operating expenses within the meaning of regulatory agreement. These expenses are not incidental to the everyday operation of the project. As previously determined the filing of the Chapter 11 petition and the subsequent proceedings before this court are merely a continuation of efforts to avoid foreclosure. *In Re EES Lambert Associates*, 43 B.R. at 691. Expenditures of effort and monies to effect a sale of the project is an effort by the partnership to recapture what it can of its investment. As such they are akin to capital expenditures which are excluded from the term "operating expense". *Thompson v. United States*, 408 F.2d 1075, 1080 (8th Cir. 1969). Expenses of this character must be considered necessary to protect the investors, a personal expense of the partnership, and not necessary for the operation of Lambert Quarter in the limited sense meant by HUD's regulatory Agreement.

█ Schwartz & Freeman seek compensation for services rendered as bankruptcy counsel to the Lambert partnership before

and after the chapter 11 petition was filed. Such general services rendered a debtor and debtor-in-possession do not benefit a secured creditor such as HUD. They are incidental to the debtor's attempt to reorganize, and are not recoverable under § 506(c). *In Re Flagstaff Food Service Corp.*, 739 F.2d 73, 76 (2d Cir.1984); *accord In Re Bob Grissett Golf Shoppes, Inc.*, 50 B.R. 598, 608 (Bankr.E.D.Va.1985) *and, In Re Sonoma V*, 24 B.R. 600, 603–04 (Bankr. 9th Cir.1982). This court fully agrees with Judge Schwartz's conclusion that in cases of this type concerning HUD insured multi-family housing projects the primary benefit of the partnership's reorganization accrues to the debtor rather than to the project or its tenants. *In Re Michigan Beach Apartments*, 61 B.R. 446, 449–50 (Bankr.N.D.Ill.1986).

Under appropriate circumstances, the fees incurred to sell the apartment complex may be a reasonable, necessary cost and expense of disposing of the HUD's property and recoverable under § 506(c). 11 U.S.C. § 506(c). The key question, however, is whether any benefit was received by the secured creditor. Any such recovery is measured not by the services rendered but by the necessity and benefit involved. *In Re Codesco, Inc.*, 18 B.R. 225, 229 (Bankr.S.D.N.Y.1982). In addition, recovery is usually limited to the actual foreclosure costs the secured creditor saved. Where proceeds of sale are sufficient to cover costs of sale and satisfy the creditor's secured claim, the creditor is considered to have received no benefit because its claim would have been satisfied without the intervention of the trustee or debtor-in-possession. *In Re Codesco*, 18 B.R. at 228, 299; *see also In Re Truitt*, 15 B.R. 169, 170–72 (Bankr.N.D.Ga.1981).

Therefore, an award of interim compensation under § 506(c) for legal services rendered in connection with the sale of Lambert Quarter would be premature at this time. Whether or not the legal services rendered in connection with the sale of Lambert Quarter are of benefit to HUD cannot be determined until the property is in fact sold, and recovery of fees would then be limited to the expense of foreclosure that HUD saved.

In sum, Lambert has the right to pay the previously discussed fees for fire and real estate (in amounts yet to be determined) without regard to the status of HUD's secured claim, because they were operating expenses and the award is founded in part on § 506(c). *See Matter of Trim-X*, 695 F.2d 296, 298–99. The remaining fees for services rendered to represent Lambert as a debtor-in-possession and to effect a sale of Lambert Quarter are not at this juncture chargeable to HUD under § 506(c) and therefore they stand on an entirely different footing.

If there are no unencumbered assets, the latter fees are simply not the obligation of HUD, the debtor's sole secured creditor. *In Re Flagstaff*, 739 F.2d 73, 77 (2d Cir. 1984). The court may find it appropriate to authorize payment of professional fees from a secured creditors collateral when there are adequate unencumbered assets in the estate or the court has adequate assurance that there will be. *In Re American Resources Management*, 51 B.R. 713, 719 (Bankr.D.Utah 1985). However, the debtor must also adequately protect the value of the creditor's interest in the cash collateral to be used. See *In Re American Mariner Industries, Inc.*, 734 F.2d 426, 432 (9th Cir.1984).

No evidence has yet been presented to enable this court to determine whether or not the Lambert estate has any unencumbered assets. Debtor valued the project at $6,000,000 in its schedules. This valuation if accurate would result in HUD being oversecured by approximately $500,000. Debtor apparently retained William McCann, M.A.I. to appraise the project in March of 1984, but his report is not of record. HUD asserts that it appraised the property at $5,140,000 as of February of 1984. That valuation if accurate would appear to leave it undersecured by approximately $400,000.

Debtor indicates it has entered into two contracts for the sale of Lambert Quarter,

both with the same purchaser. Although the second contract may still be in effect, consummation is questionable. Lambert has not yet apprised the court of the price the project is commanding so as to provide some indication of the potential a sale will result in satisfaction of HUD's lien.

Lambert is currently required to make adequate protection payments of $49,698.35 per month to HUD. If HUD is correct, the debtor has not been able to make all the required payments. Further, an examination of the monthly operating reports raises some question as to whether the project is able to carry the mortgage obligation to HUD.

Finally, the debtor has yet to propose a plan of reorganization, having moved for extensions of time since the commencement of this case. The trustee's motion to dismiss this case is soon coming on for hearing.

Under the circumstances of this case, further hearings will be required before any interim compensation at all will be allowed and paid. First, Schwartz & Freeman must meet HUD's objection and establish by evidence that the services it rendered in connection with the fire and real estate taxes were necessary and reasonable. Second, an evidentiary hearing will be required to determine if any portion of the Lambert estate is not encumbered by HUD's mortgage lien. If and only if there are unencumbered assets will the court consider allowing compensation for services that are not operating expenses, provided Lambert can adequately protect HUD's interest in the cash collateral to be used as permitted by 11 U.S.C. § 361, 363(e).

*Determining Adequate Protection*

 Adequacy of protection is determined in different ways among the circuits, either under the approach in *In Re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir., 1984), or under the more flexible approach of *In Re Briggs Transp. Co.,* 780 F.2d 1339, 1349 (8th Cir.1985). Cash collateral is a unique form of collateral that requires special protection since it is most likely to be consumed during the reorganization process and is at times subject to change on an almost daily basis. *Matter of Cropper Co. Inc.,* 35 B.R. 625, 633 (Bankr.M.D.Ga.1983). Its use must be prohibited or conditioned as is necessary to provide adequate protection of the secured creditor's interest. 11 U.S.C. § 363(e).

 Lambert bears the burden of selecting and structuring a means to adequately protect HUD interest in any cash collateral to be used. Both *American Mariner Industries* and *Briggs Transp. Co., supra* involved a creditor seeking relief from the automatic stay. Both courts agreed when adequate protection is at issue the court must determine what interest of the credit in the debtor's property must be protected. *In Re Briggs Transp. Co.,* 780 F.2d at 1344-46; *In Re American Mariner,* 734 F.2d at 430-32. In *Briggs Transp. Co.,* the court stated that "adequate protection is the protection of a secured creditors 'interest in property' from any decrease in value attributable [sic] to the stay.... The concept requires the debtor to propose some form of relief that will preserve a secured creditor's interest in the collateral." *In Re Briggs Transp. Co.,* 780 F.2d at 1344. In *American Mariner Industries,* the court stated the case by case development of adequate protection "must recognize and protect the *value* of a creditor's interest when ... that value is demonstrated to exist and is measurably threatened ... [W]hether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value. *In Re American Mariner Industries, Inc.,* 734 F.2d at 432 (emphasis in original).

 The interest to be protected in this case is not limited to HUD's loss of the immediate right to foreclose due to the automatic stay. The debtors request to use cash collateral also threatens HUD with loss of the right to apply all project income to satisfy the mortgage obligation. It is the value of these interests Lambert must fully protect from loss. If Lambert

does not come forward with a proposal of adequate protection, its use of HUD's cash collateral can be denied notwithstanding the existence of unencumbered assets. *See Matter of Hollie*, 42 B.R. 111, 120 (Bankr. M.D.Ga.1984). "The Court is not obligated to fashion sua sponte a mechanism which it believes will adequately protect the secured creditor." *In Re Arriens*, 25 B.R. 79, 81 (Bankr.D.Or.1982).

The cases Lambert cites on the issue of adequate protection are of no assistance to it. In *In Re Arriens*, 25 B.R. 79 (Bankr.D. Or.1982) the bankruptcy judge allowed the use of income from hotel room rentals to clear operating expenses. *In Re Arriens*, 25 B.R. at 80. In *In Re Thompson*, 5 B.R. 667 (Bankr.D.S.D.1980) the bankruptcy court approved the use of cash collateral to purchase bees and beehives to continue operation of the debtors business and the debtor offered substitute collateral. *In Re Thompson*, 5 B.R. at 668.

Lambert is not seeking the use of cash collateral to pay operating expenses of Lambert Quarter. Its proposed use of HUD cash collateral is to pay attorneys fees, most of which are not operating expenses. Therefore the cases it cites are not authority for its proposed use of cash collateral.

Section 361 of the Bankruptcy Code set forth three methods of providing adequate protection which are illustrative and not exhaustive. Unless the resources of its general partner are at its disposal, which may in fact be an alternative, only one method is available to the Lambert estate. It has no property, at least none in this estate, to offer HUD a viable additional or replacement lien. Its proposal merely to continue the periodic cash payment already required to adequately protect HUD from loss attributable to the automatic stay seems inadequate for this additional purpose. Even if it has made all the previously required payments, that would offer HUD no protection against loss due to the use of its cash collateral.

Therefore, if Lambert proves unencumbered assets and seeks to use HUD cash collateral, it must fashion a means that will as nearly as possibly provide HUD with its bargained-for rights. *See, In Re Briggs Transp. Co.*, 780 F.2d at 1346. It must determine a way, with or without financial assistance or guarantee and indemnification from its general partner, to offer protection against loss in the value of HUD interest in the cash collateral it proposes to use for fees. *See, In Re American Mariner Industries, Inc.*, 734 F.2d at 432.

Section 361(3) describes this form of adequate protection as that which "will result in the realization by the secured creditor of the "indubitable equivalent" of the creditors interest in such property. 11 U.S.C. § 361.

### Conclusion

The court has considered the application of Brian Meltzer of the law firm Schwartz & Freeman for interim compensation to be paid from the estate of debtor EES Lambert Associates with the use of cash collateral in which the debtor's sole secured creditor HUD has an interest. The court has concluded thus far that debtor has the right to pay fees due its accountant and also those attorneys' fees which constitute reasonable operating expenses of the apartment complex and are for that reason chargeable against the secured creditors under 11 U.S.C. § 506(e). The latter fees can be allowed and paid to the extent that their necessity and reasonableness are established. Remaining fees sought, *inter alia* for representation of the Lambert partnership before this court and the proposed sale of the apartment complex, are not reasonable operating expenses or the obligation of the secured creditor. Those fees will not be allowed unless there exist unencumbered assets in the Lambert estate and the debtor can adequately protect HUD's interest in any of its cash collateral to be used. Any such fees will also be subject to scrutiny and disallowance for lack of necessity or reasonableness if that is found.

"Lambert's contention that this ruling deprives it of the statutory right to file a petition in bankruptcy is unavailing." *In Re EES Lambert Associates*, 63 B.R. 174

(N.D.Ill.1986). The HUD regulatory Agreement and statutory limits on debtor prohibit it from using project income to fuel its chapter 11, except to the limited extent set forth in this Memorandum Opinion.

Of course, nothing prevents Lambert from remaining a debtor in chapter 11, protecting its investment, and paying its attorneys with use of non-project funds advanced by the partners.

This matter will be called for status hearing June 9, 1986 at 10:30 A.M. at the same time that the U.S. Trustee's motion to dismiss is set for hearing; thereafter for hearing of evidence so as to make the remaining findings required in accordance with this Memorandum Opinion, on July 16th, 1986 at 10:30 A.M. Pretrial order therefor has been entered separately this date. At the June 9th status hearing, debtor's counsel will report whether the $40,500 in fees earlier ordered returned to debtor was in fact returned to this estate, and if not why not.

On June 9th, debtor's counsel will supply a draft order for allowance of accounting fees to David Dahl and the firm of Leaf, Dahl and Company, Ltd. in the amount of $5,650, for entry that day.